## Appeal of WHEN CLOTHING CO.                    Docket No. 428.

Estimated reasonable compensation of officers which has neither been paid nor accrued upon the books of a taxpayer corporation can not be allowed as an expense deduction.

Depreciation of advertising signs painted on roofs of buildings on the basis of a six-year life of such signs held to be a reasonable allowance.

Such assets as trade-marks and leaseholds can not be made the basis of a deduction for depreciation or exhaustion in the absence of convincing proof of either the cost or the March 1, 1913, value of such assets.

A claim for the deduction of interest accrued upon unpaid stock subscriptions disallowed, it appearing that such interest should have been treated as paid.

Evidence concerning the writing down of inventory values considered and held not to support a claim that the inventory was taken at cost or market, whichever is lower.

Book balances of unpaid stock subscriptions written off as of the first day of a taxable year can not be included in invested capital.

Reduction of invested capital by the amount of hypothetical depreciation considered and adjusted in accordance with the estimated life of the asset.

Claim for a paid-in surplus at the time of the organization of the corporation can not be allowed in the absence of convincing proof of the value of the asset upon which such claim is predicated.

Submitted January 2, 1925; decided April 8, 1925.

*Benjamin Mahler, Esq.*, for the taxpayer.

*Laurence Graves, Esq.*, for the Commissioner.

Before JAMES, STERNHAGEN, and TRUSSELL.

This is an appeal from a determination by the Commissioner that deficiencies in taxes should be assessed for the year 1919 and 1920, aggregating $3,800.36.

In controverting the correctness of these asserted deficiencies the taxpayer contends that it should be allowed the benefit of certain deductions from gross income which the Commissioner has refused to consider or which are here presented for the first time. The taxpayer also claims that the Commissioner should have allowed the alleged value of a leasehold as paid-in surplus and certain other adjustments of invested capital.

### FINDINGS OF FACT.

The taxpayer is an Indiana corporation organized in 1901 with principal offices at Indianapolis, Indiana. Its books of account are kept on an accrual basis.

At the time of its organization it acquired from a predecessor partnership a going business, the assets of which were taken over and entered upon the taxpayer's books of account as follows:

| | |
|---|---:|
| Merchandise | $99,161.38 |
| Furniture and fixtures | 16,838.62 |
| Advertising privileges | 5,000.00 |
| Trade-mark "When" | 29,000.00 |
| Total | 150,000.00 |

and for these assets the taxpayer issued its capital stock of a par value of $150,000.

At the time of its organization the taxpayer also acquired a lease of store premises consisting of a store room on the ground floor about 95 feet street frontage and 120 feet deep, at a rental of $10,000 a year, with free use of electric current, for a term of ten years from and after March 1, 1901, with an option for a renewal for a similar period at a rental to be agreed upon at the time of the renewal. This lease was not then capitalized for any amount and did not appear on the taxpayer's books as a capital asset at that time or at any time.

In 1908 the taxpayer surrendered its then existing lease, which still had a period of three years plus ten years renewal privilege,

and, in lieu thereof acquired a lease of the entire four-story building, having a street frontage of 142 feet and a depth of 120 feet, at an annual rental of $20,000 plus taxes on the property for a term of 30 years. In 1913 this lease had a prospective life of 25 years.

Thereupon the taxpayer proceeded to erect additions to and make general improvements in the building at a cost of $41,676.96, which amount was capitalized on the books of the taxpayer. This account stood on the books on December 31, 1918, and in the balance sheet in the amount of $26,676.96. The revenue agent reported finding that the books showed that this asset had been written down on account of depreciation, wear and tear in the sum of $15,000. The examining agent in his computation of invested capital restored this item of $15,000 to the capital account and then computed depreciation upon the total cost of this asset at the rate of $3\frac{1}{2}$ per cent for the entire period from 1908 to 1918, inclusive.

The trade-mark "When" had been owned by the predecessor partnership, was taken over by the taxpayer among the other assets, and upon the books of the taxpayer was entered as $29,000, which amount is a part of the total for which the company's stock was issued. This same value of trade-mark continued as a part of the stated assets of the taxpayer until or including January 1, 1919.

At the organization of the company the furniture and fixture account of its predecessor was taken over at a valuation of $16,838.62. On December 31, 1918, the balance sheet showed this asset as having a value of $12,395.05. The examining agent reported finding that the books showed that this capital account had been written down on account of exhaustion, wear and tear between the date of organization of the company and December 31, 1918, in the sum of $10,746.09. The revenue agent in computing invested capital restored this last item to the capital account and then computed depreciation at the rate of 5 per cent upon the original cost of the items entering into the account.

The revenue agent also allowed depreciation upon the advertising signs account at the rate of 4 per cent and computed hypothetical depreciation upon the entire depreciable property accumulated from the time of the organization until December 31, 1918, in a total of $38,225.68, which he eliminated from the taxpayer's invested capital, and these computations were followed by the Commissioner in his computation of the deficiencies.

The capital asset described as advertising privileges consisted of signs painted on roofs of barns and other buildings and metallic signs placed on walls, all exposed to the elements, and on January 1, 1919, the book value of all these signs was $11,750. In the absence of constant repairs and repainting these signs do not have a probable life in excess of six years.

H. N. Hempstead was one of the original organizers of the taxpayer company and during the years 1919 and 1920 he and members of his family owned all the stock in the taxpayer company. During all the time since the company's organization he was generally active in the management of its business, although not during all of the time was he a resident of Indianapolis. For the year 1920 in his individual income-tax return he included among his items of gross income salary compensation from the taxpayer in the sum of

$3,000, which amount, however, had not been paid to or received by him.

On November 13, 1906, the taxpayer, desiring to interest some of its employees in the business and to encourage such employees to purchase stock of the company, entered into arrangements with three of such employees under which they (the employees) had the opportunity of purchasing shares of stock and paying for the same by having credited to their stock accounts dividends which might be declared upon such stock or by making any other payments from time to time as they might wish to make. In carrying out this plan stock accounts were opened on November 13, 1906, as follows: J. P. Bonn $15,000, L. J. Burdell $5,000, and S. E. Bradshaw $5,000. These accounts were from time to time debited with interest upon the unpaid balances and credited with such dividends as were declared upon the amount of stock described and such other payments as the employees chose from time to time to make. On January 1, 1919, these accounts stood as follows: J. P. Bonn $8,900, L. J. Burdell $2,900, and S. E. Bradshaw $3,864.52. Between the time of opening these accounts and January 1, 1919, interest had been charged upon the same as follows: J. P. Bonn $3,415.97, L. J. Burdell $1,137.37, and S. E. Bradshaw $922, and Bonn's account had been credited with dividends aggregating $6,900 and other cash payments aggregating $2,615.17, Burdell's account had been credited with dividends aggregating $2,300 and other cash payments aggregating $1,237.37, and Bradshaw's account had been credited with a bonus in the amount of $1,135.98.

### DECISION.

The deficiency in tax for each of the years 1919 and 1920 should be recomputed in accordance with the following opinion. Final decision will be settled on consent or on fifteen days' notice under Rule 50.

### OPINION.

Trussell: In its petition and at the hearing of this appeal the taxpayer contended that, in the adjustment of its income and profits tax liability for the years 1919 and 1920, it should have been and should now be allowed the benefit of certain deductions from gross income and certain adjustments of invested capital, all of which have either heretofore been rejected by the Commissioner or are now first presented for consideration. These contentions will be taken up in the following order:

1. *Compensation of officers.*—The taxpayer claims that it should have the benefit of a deduction from gross income of an amount of $3,000 per year as reasonable compensation of its president who was the principal stockholder and managing officer. It claims this deduction in the amount of $3,000 per year. The record shows no corporate action authorizing the payment of any compensation to the president of the company for the years under consideration. No entry of such compensation has been made upon the books of account, nor any liability therefor accrued upon such books for these years and no compensation has been paid. Upon this record

we are unable to find any warrant for allowing the deduction claimed and the Commissioner's decision with respect to this deduction should be approved.

2. *Depreciation of advertising signs.*—In closing its accounts for the years 1919 and 1920 the taxpayer computed depreciation upon its advertising signs and similar equipment at the rate of 15 per cent of the book value of these properties. We have found that this kind of equipment has a probable life in the absence of frequent repainting and repairs of not to exceed six years. Beginning with the year 1919, the taxpayer discontinued the up-keep of this class of equipment, thus eliminating from its accounts the annual expense items of repairs and repainting of signs. Under these circumstances we are of the opinion that the rate of depreciation claimed by the taxpayer is reasonable and that the deduction should be allowed.

3. *Depreciation of trade-mark.*—Taxpayer's trade-mark asset was acquired for stock, the capital value being stated at $29,000. The record of this appeal, however, is wholly silent as to what may have been the actual cash value of this asset at the time taken over by the taxpayer corporation. The fact that stock in the amount of $29,000 was issued for an intangible asset, cannot be accepted as establishing the cash cost of such asset, and there being no other evidence of value in the record taxpayer's claim for depreciation of this asset should not be allowed.

4. *Depreciation of leasehold.*—This taxpayer at the time of its organization took over a lease of certain store premises, having a fixed term of ten years with option for renewal. In 1908 it surrendered the original lease and negotiated in lieu thereof a new lease including not only the store premises but the entire building of which the store premises were a part. This latter lease was made for a term of 30 years and on March 1, 1913, still had a probable life of 25 years. The taxpayer never carried either the original or the substituted lease upon its books at any value. The lease originally taken over by the company had, of course, expired prior to March 1, 1913. The new lease was acquired in the ordinary course of business and without any actual capital outlay. If this new lease had on March 1, 1913, any definitely ascertainable capital value the taxpayer might rightfully claim some amount of depreciation of such value. In the record of this appeal there is some testimony to the effect that the terms of this lease were very favorable to the taxpayer; that the annual rental was less in amount than that paid by tenants of other buildings along the same street. This testimony, however, was indefinite and to a considerable extent speculative and furnished no reliable data from which could be evolved a formula for computing the March 1, 1913, value and the taxpayer did not produce any other testimony in support of its own estimate of such value. Upon this record we are unable to find any definite March 1, 1913, value of this leasehold and are forced to the conclusion that we cannot hold the taxpayer to be entitled to any deduction for its exhaustion.

5. *Accrued interest on unpaid stock subscriptions.*—In 1906 the taxpayer opened up accounts with three of its employees, charging to such accounts the par value of certain shares of stock proposed to be purchased by such employees according to the terms of an agreement with them. This account was from time to time charged

with interest on the unpaid balances and credited with dividends declared upon the stock and some other payments made by the purchasing employees. The taxpayer claims that it should be allowed to deduct the amount of $4,553.34, alleged to be the interest accrued upon these unpaid subscriptions for capital stock purchased by employees. It appears from the record that this amount of interest had been charged on the books against the stock accounts of employees Bonn and Burdell. It also appears that these two accounts had been credited respectively with amounts of dividends and other cash payments, totaling in each case an amount in excess of the amount of interest charged and, while it may be that credits to either account have not been specifically allocated against the accruing interest and the principal of such accounts, it is our opinion that in the keeping of such accounts the credits should be first applied to the extinguishment of the annually accruing interest and the balance of such credits only applied against the principal. Accepting this view we must find that the amount of interest charged to these accounts has been paid and that the deduction claimed by the taxpayer should be disallowed.

6. *Inventory adjustments.*—In taking its annual inventories at the end of each of the years 1919 and 1920 the taxpayer wrote down certain of its inventory cost values in the amounts of $8,772.39 for the year 1919 and $5,056 for the year 1920. The taxpayer kept its inventories upon a system of cards, somewhat in the nature of a perpetual inventory system, and at or near the end of accounting periods entered upon some of these cards a percentage reduction of value in various departments of its store. The practice of the taxpayer in this respect does not appear to indicate any consistent method of reducing inventory costs to market value. The changes in inventory values are too infrequent to warrant us in holding that the taxpayer took its closing inventories for the years under consideration at cost or market, whichever is lower. We are thus led to the conclusion that the Commissioner's action in disallowing these inventory write-downs should be approved.

7. *Elimination of stock subscriptions from invested capital.*—The three employees' stock subscription accounts shown in the findings of fact stood on the books of the taxpayer on December 31, 1918, with a total debit balance of $15,664.52. So far as we can determine from the record this amount was written off as of January 1, 1919, and the liability of the employees upon such accounts was then canceled. The asset value of these accounts thus disappeared and their elimination from invested capital should be approved.

8. *Reduction of invested capital on account of alleged depreciation.*—Prior to January 1, 1919, the taxpayer had written off depreciation on its furniture and fixtures account in the sum of $10,746.09 and on its account for improvements upon leased premises in the amount of $15,000. These amounts were restored to the capital account and then a deduction made for depreciation upon these assets at a hypothetical rate determined by the revenue agent and approved by the Commissioner. The record does not show whether the amount written off by the taxpayer upon the furniture and fixtures account had been computed by any consistent methods. The total amount written off, namely, $10,746.09, seems to be an entirely reasonable

reduction of this asset on account of its use in business and we are of the opinion that the invested capital for the years 1919 and 1920 should not now be disturbed by any recomputation of depreciation upon furniture and fixtures. The improvements upon the leased premises were made in the year 1908 and cost $41,676.96. At that time the lease had an unexpired life of 30 years and this capital cost should be depreciated ratably over the period of 30 years. Any modification in invested capital for the years under consideration which a recomputation of depreciation of this asset on that basis will produce should be approved.

9. *Claim for a paid-in surplus.*—The taxpayer has contended that at the time of its organization it took over a leasehold interest in the store premises, which was not then entered upon its books of account and for which no stock was specifically issued, and that it should now be permitted to add to its invested capital such an amount as could be found to be the value of that lease, and the taxpayer has estimated such value at $100,000. The record discloses that the taxpayer did actually take over such a lease and that it was not capitalized in any way or for any amount. The testimony concerning its value is indefinite, speculative, and fails to furnish any basis upon which a leasehold value can be computed, and if we should allow that some value should have been attached to such a leasehold at the time of the organization of the taxpayer company such value would necessarily have been written off ratably over the period during which the lease continued to run. The original lease had only a ten-year life and any value which it may have had at the inception of the taxpayer corporation would have disappeared long before the years here under consideration. The succeeding leasehold was acquired by the taxpayer in the ordinary course of business without expense or capital outlay of any kind and therefore cannot be considered as an element of invested capital.